SALTER, J.
(dissenting).
I respectfully dissent. The final summary judgment for Mastec should be reversed for two independently sufficient reasons. First, Mastec’s affidavit fails to eliminate genuine issues of material fact raised by Satellite’s opposing affidavits. Second, this case is one in which a contractor (appellee, Mastec) attempts to take financial advantage of its own subcontractor (appellant, Satellite), requiring a particularly skeptical look at Mastec’s “discovery” that its own subcontractor lacks the allegedly-neeessary electrician’s license. Mastec made no showing that it had either (a) reimbursed the consumers for the services performed by Satellite but paid for through DirecTV to Mastec (attaching satellite dishes to residences and apartments, and making service calls to help DirecTV customers operate or replace their satellite television recorders and receivers), or (b) sent a licensed electrician to those homes and apartments to be certain that the work done by Satellite conformed to the allegedly-applicable codes.
Mastec held out Satellite as a subcontractor qualified to install home satellite antennas, and Mastec charged and collected from the homeowners for Satellite’s work after the installation. Only when other disagreements arose did Mastec decide that Mastec could avoid payment to Satellite because Satellite supposedly needed an electrical contractor’s license. We should not permit a statute enacted for the protection of the public (from unlicensed contractors) to become the contractor-who-should-know-better’s device for stiffing the subcontractor but keeping the homeowners’ payments.

Background

The undisputed facts are straightforward. Mastec is part of a large publicly-traded corporate group with lines of business that include telecommunications products and services. Mastec provided equipment installation and service to national *792 cable and satellite television providers, and it hired Satellite to execute work orders for specified dollar amounts. Under two contracts between the parties, Satellite was to install and service residential satellite dishes, outlets, receiver/decoders, and similar equipment. Mastec billed the satellite television customer, and Satellite billed Mastec for the flat amounts set forth in the contract.
Under them 2003 contract, Satellite agreed to be “responsible for any permits, licenses or other authorizations necessary for [Satellite] to perform the work,” and Satellite’s installers were to wear uniforms approved by Mastec. A 2005 “Home Services Subcontractor Agreement” provided additional terms and related particularly to the installation of home satellite equipment used for DirecTV systems. Under this agreement, Mastec required Satellite’s employees to be qualified, to have completed “SBCA certified installer training,” and to comply with “customer relations skills, technical skills and adherence to dress standards.” Another provision obligated Satellite to comply with “all safety, nondiscrimination, equal employment, drug and alcohol, business ethics and other rules and policies of [Mastec] and DirecTV and all applicable federal and state laws, rules and regulations of any governmental authority” in performing its work, and authorized Mastec to confirm and verify that compliance. Mastec required Satellite to waive any mechanic’s or other lien for its work and equipment, and Satellite’s right to payment was contingent on Mastec’s receipt of payment from DirecTV (which would in turn bill and collect installation charges from the homeowner). The agreements did not specifically obligate Satellite to use a licensed electrician for the installation at a home, nor did they identify any licenses, certificates, electrical codes or standards that might apply.
For reasons that are disputed, Mastec and Satellite parted company. In May 2005, Satellite commenced the lawsuit below seeking $301,553.00 for installation and other services allegedly rendered from January through April of that year. Copies of detailed invoices and job information were attached to the complaint. Mastec admitted that Satellite “purported to render services as a subcontractor,” but denied that Satellite was entitled to payment.
Mastec countered with an amended answer, affirmative defenses, and counterclaim against Satellite and six individuals, alleging breaches of contract, conspiracy, fraud, and diversions of “business, resources, personnel, and funds” to Satellite.[2] Five of the six individual counter-defendants (which Mastec referred to as the “Gang of Five”), were former employees of Mastec and its “advanced technologies division” involved in Mastec’s work for DirecTV. The sixth individual counter-defendant allegedly was the spouse of a member of the “Gang of Five.” Essentially, Mastec alleged that its own employees allowed Satellite to operate out of Mastec’s warehouse “and to use the facilities, telephone lines, and other appurtenances free of charge.” Mastec further alleged that as work orders came in for residential satellite dish installations, one or more members of Mastec’s “Gang of Five” would pick the most lucrative jobs for diversion to Satellite or another (non-party) subcontractor. Allegedly, Satellite picked up *793 equipment and materials from the Mastec warehouse, used it, and did not pay for it.
The description of a nasty business dispute in Mastec’s affirmative defenses and second amended counterclaim omits one salient allegation that was the keystone of the motion for summary judgment by Mas-tec. There was no allegation that Satellite lacked any necessary electrician’s license or that it unlawfully performed any electrical work.
Nevertheless, and without amending its pleadings, Mastec filed a motion for summary judgment asserting that Satellite was “never licensed to install or repair digital home satellite systems,” and that section 489.532, Florida Statutes (2005), precludes Satellite from recovering damages “regardless of the legal theory asserted.” Section 489.532(l)(a), a provision within the title, chapter, and part entitled “Electrical and Alarm System Contracting,” directs that an unlicensed contractor is precluded from enforcing “in law or in equity” any contract requiring licensure based on the “scope of the work to be performed under the contract.” The contractor may be considered “licensed” if it has “a primary or secondary qualifying agent” in accordance with part II of Chapter 489. Seventeen months after filing the motion for summary judgment, Mastec amended its affirmative defenses to add section 489.532 as an affirmative defense.
Mastec’s motion for summary judgment was supported by an affidavit of a senior vice president, Mr. Retherford. Mr. Reth-erford declared that he had “operated in the field of digital satellite antenna installation and servicing as an installer and supervisor since 1994;” that the scope of work to be performed by Satellite under the written contracts with Mastec included “installation of electrical wiring to conduct no more than 50 volts of electricity as part of the satellite antennas” and installation of a low noise block component “attached to each satellite dish requiring a low voltage power source of approximately 18 volts and requiring wiring to an electrical source and grounding by the installer;” and that based on his investigation, Satellite had never held any license to perform digital satellite antenna installations. Mr. Reth-erford’s affidavit did not qualify him as a licensed electrical contractor or electrician at any time;[3] did not express any qualified expert opinion that Satellite’s work required any specific license or certificate; and did not address whether Satellite employed a qualifying agent with any such license or certificate. His affidavit did not deny the allegation in the amended complaint or the plain language of the Mastec-Satellite agreements regarding Mastec’s receipt and retention of the homeowners’ payments for the supposedly-unlicensed work performed by Satellite. His affidavit reported that he had checked with the Florida Department of Business and Professional Regulation (DBPR) to investigate whether Satellite was licensed as an electrician, and that he confirmed Satellite held no such license.
For its part, Satellite filed opposing affidavits executed by its president and by a licensed electrician who provided electrical quality control and authorized Satellite to “operate under my license.”[4] The president of Satellite, though not herself a licensed electrician, declared that Satellite “never installed, maintained, repaired, al *794 tered or extended any low voltage electrical construction or wiring;” that Satellite did not ground live wire, but grounded the wire from a dead source that was not plugged in; and that Satellite did not engage in the electrical trade. The licensed electrician explained in his affidavit that Satellite does not work with live electrical cables, merely running an antenna cable from the dish to the receptor cable below. He further declared that the “grounding” does not involve the electrical current from the house; it “is done in case of electrical charges originating from lightning.”[5]
The trial court granted Mastec’s motion for summary judgment, and this appeal followed.

Analysis

We review the final summary judgment de novo. The trial court was not to weigh the evidence or adjudge the credibility of the witnesses; all doubts and inferences were to be resolved in favor of Satellite; and if the “slightest doubt” existed, then summary judgment should not have been granted. Sheikh v. Coregis Ins. Co., 943 So.2d 242, 243-44 (Fla. 3d DCA 2006).
Mastec’s affidavit and Satellite’s two opposing affidavits created genuine issues of material fact regarding at least these issues: (1) the requirement that Satellite be licensed or certified at all for the type of work performed, and (2) if there was any such requirement, whether Satellite had a licensed qualifying agent for the work. Mastec’s affiant does not appear to have been qualified to express any opinion regarding the electrical work allegedly performed. The definition of “electrical contractor” in section 489.505(12), Florida Statutes (2005), includes terms that are fact intensive: “a person who conducts business in the electrical trade field and who has the experience, knowledge, and skill to install, repair, alter, add to, or design, in compliance with the law, electrical wiring, fixtures, appliances, apparatus, raceways, conduit, or any part thereof, which generates, transmits, transforms, or utilizes electrical energy in any form.... ” Rules, electrical codes and standards, and interpretive positions in particular cases guide the DBPR Electrical Contractors’ Licensing Board in determining whether a license is or is not required for specific types of work.
My learned colleagues agree with the trial court that Satellite was required to install “wiring” and that this must require a license. In fact, however, Satellite provided evidence that voice and data cables are exempt from National Electrical Code and licensure requirements. Did “wiring” in Satellite’s scope of work refer to lines conducting electricity, or to voice and data cables? Is an “outlet” a receptacle for a data cable rather than a standard 110-volt electrical outlet? The majority’s references to Mastec’s “investigation” with DBPR and to a DBPR on-line webpage regarding “satellite television wiring” are not “summary judgment evidence” as defined in Florida Rule of Civil Procedure 1.510(c) and would not be admissible in evidence. No licensed electrician or representative of DBPR offered a professional opinion that Satellite’s work had to be licensed. A genuine issue of fact exists regarding the types of work performed by Satellite.
The limited record before us does not establish that Satellite was required, as a matter of law, to obtain an electrical license for the work it performed and for *795 which it sought payment.[6] In the recent case of MMII v. Silvester, 42 So.3d 876 (Fla. 4th DCA 2010), the Fourth District conducted a similar analysis and determined that an “elaborate audio entertainment system” in a residence, requiring the installer to deal in “low voltage electricity and wiring,” does not require the installer to obtain a contractor or electrical contractor license. For these reasons, the summary judgment should be reversed.
The second legal issue presented by the pleadings and this record is whether a statute expressly enacted for the protection of the homeovmers, not Mastec, from “incompetent or dishonest contractors”[7] is now to be relied upon by the sophisticated contractor, Mastec, which contracted for, oversaw, and collected payment for, the purportedly unlicensed work. In my view, the statutory bar should not be available to a contractor that knowingly retains the payments for the very work that Mastec now contends was unlawfully performed. Absent detailed pleading and the disgorgement of the proceeds of the supposedly-unlawful work to the homeowners who paid, Mastec should be estopped to assert the statutory bar. Moreover, in its counterclaims, Mastec sought to recover from Satellite the proceeds of “the most lucrative installation jobs” supposedly diverted by Mastec’s “Gang of Five” employees to Satellite. Mastec’s contrary position in its motion for summary judgment (that no such proceeds could be payable because the installations were unlicensed) left open a genuine and material factual issue. Our de novo review must include Mastec’s directly contradictory positions that it owes Satellite nothing for the installations (because the work was purportedly unlicensed); that Mastec may nonetheless retain the payments from consumers for Satellite’s work; that Mastec need not remedy the supposedly-unlicensed work as part of its obligation to its own customers; and that Satellite owes Mastec money for installations that should not have been directed to Satellite by Mastec employees. To ignore that sophistry is to countenance misapplication of the statutory bar. See Kvaerner Const., Inc. v. Am. Safety Cas. Ins. Co., 847 So.2d 534 (Fla. 5th DCA 2003) (finding that contractor’s knowledge regarding subcontractor’s unlicensed work barred indirect recovery from surety by contractor).
For this second reason as well, I respectfully dissent. I would reverse the summary judgment and remand this case for trial.

. After Mastec's affirmative defenses and counterclaims were filed, Satellite amended its complaint to add claims for violations of Florida’s Deceptive and Unfair Trade Practice Act, sections 501.201-.23 (2005), and fraudulent inducement. Mastec then filed an answer and affirmative defenses to the amended complaint and Mastec’s own second amended counterclaim.

. Although Mr. Retherford declared that he had been a satellite antenna installer and supervisor for 12 years, he did not say that he himself had ever obtained any license or certificate to perform that work.

. Indulging all inferences in favor of the non-moving party as required by the applicable standard of review, the affiant agreed to be a qualifying agent for Satellite.

. Installation or repair of lightning rods or related systems is expressly exempted from the electrical contracting licensure provisions in section 489.503(22), Florida Statutes (2008).

. Additionally, Satellite’s contracts and invoices in the record reflect numerous "service calls” for $25.00, "Tivo upgrades” for $10.00 each, and other recorder/receiver charges. Mastec's affidavit does not address these charges or the work performed. As a matter of common sense, Mastec reviewed the invoices for a satellite dish installation — for $60.00 — a charge that hardly could have in-eluded any significant work by a licensed electrician. On the record before us, Mastec could not have been shocked, shocked, to find that Satellite's employees were dish installers, not electricians.

. Castro v. Sangles, 637 So.2d 989, 991 (Fla. 3d DCA 1994) (reviewing the history of, and rationale for, the licensure requirement).